# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THOMAS E. MARRA, JR.,       :
      Petitioner,           :
                       :
      v.                    :          No. 3:18-cv-389 (SRU)
                       :
ROLLIN COOK, et al.,        :
      Respondents.        :

## RULING ON MOTION TO DISMISS

On March 5, 2018, Thomas E. Marra, Jr., an inmate currently confined at the Garner

Correctional Institution in Newtown, Connecticut, brought a *pro se* petition for writ of habeas

corpus under 28 U.S.C. § 2254 against Scott Semple, the Commissioner of the Connecticut

Department of Correction ("the respondent").[1] Pet., Doc. No. 1. In his petition, Marra

challenges his 1988 state convictions for accessory to kidnapping, attempted kidnapping,

conspiracy to commit kidnapping, arson, and larceny. *Id.* On November 7, 2018, the respondent

moved to dismiss the petition as untimely and, alternatively, for failure to exhaust state court

remedies. Mot. to Dismiss, Doc. No. 27; Mem. of Law in Supp. of Mot. to Dismiss ("Resp't

Mem."), Doc. No. 27-1. In response, Marra filed a motion to withdraw his petition "without

prejudice so that [he] can exhaust the claims that the [r]espondent alleges [he] did not fully

exhaust[] in state court." Pet'r's Mot. to Withdraw Without Prejudice Pet'r's 2254 Pet. for Writ

of Habeas Corpus ("Marra's Mot. to Withdraw"), Doc. No. 30. I ordered Marra to file a

supplemental response to the Motion to Dismiss explaining why his petition should not be

---

[1] As of January 2019, Rollin Cook has replaced Scott Semple as the Commissioner of Correction for the State of Connecticut. Accordingly, the Court directs the clerk to replace Scott Semple with Rollin Cook as the respondent to this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

dismissed as time-barred. *See* Order, Doc. No. 30. Marra filed a supplemental response in which he argued: (1) his previous federal petition was dismissed without prejudice subject to refiling after proper exhaustion, and (2) he is entitled to equitable tolling. Pet'r's Suppl. Resp. to Resp't's Mot. to Dismiss ("Marra's Suppl. Resp."), Doc. No. 32. For the following reasons, the Motion to Dismiss is **GRANTED** and the Motion to Withdraw is **DENIED.**

I.  Standard of Review

District courts review a motion to dismiss a petition for writ of habeas corpus according to the same principles as a motion to dismiss a civil complaint under Fed. R. Civ. P. 12(b)(6). *See Purdy v. Bennett*, 214 F. Supp. 2d 348, 353 (S.D.N.Y. 2002). To survive a motion to dismiss, the petition "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when . . . [the] [petitioner] pleads factual content that allows [me] to draw the reasonable inference that the [respondent is] liable for the misconduct alleged." *Id.*

I must accept as true the factual allegations in the petition and draw all reasonable inferences in Marra's favor. *Ashcroft*, 556 U.S. at 678. This principle does not, however, apply to the legal conclusions that Marra draws in his petition. *Id.*; *Bell Atlantic Corp.*, 550 U.S. at 555; *see also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same). Accordingly, I am not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)).

Because the petition was filed *pro se*, "it must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)). Nevertheless, a *pro se* petition still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Ashcroft,* 556 U.S. at 678).

Finally, in deciding a motion to dismiss, I may consider "statements or documents incorporated into the [petition] by reference . . . and documents possessed by or known to [Marra] and upon which [he] relied in bringing the [petition]." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). I may also "take judicial notice of public records such as pleadings, orders, judgments, and other documents from prior litigation, including state court cases." *Lynn v. McCormick*, 2017 WL 6507112, at *3 (S.D.N.Y. Dec. 18, 2017) (citing *Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 349 n.6 (S.D.N.Y. 2012)); *see also Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

## II.   Facts and Procedural History

On August 10, 1988, a jury convicted Marra in state court of accessory to kidnapping in the first degree, conspiracy to commit kidnapping in the first degree, two counts of attempted kidnapping in the first degree, arson in the second degree, and larceny in the second degree for his role in the disappearance of Richard Noel on January 23, 1984. Pet. at 1; Direct Appeal R., Resp't App. A, Doc. No. 27-3 at 24; *State v. Marra*, 215 Conn. 716, 718-19 (1990), Resp't App. D, Doc. No. 27-6. The state court sentenced him to sixty-five years of imprisonment. Pet. at 1; *Marra*, 215 Conn. at 719. As stated by the Connecticut Supreme Court, the jury reasonably could have found the following facts:

> Sometime during 1981, [Marra] began selling stolen automobiles to J.W. Ownby, who lived in Kansas City, Missouri. [Marra]'s job was to deliver the stolen autos

to New York City, where Ownby would pick them up and drive them back to Kansas City. In 1982, [Marra] introduced Noel, the victim, to Ownby. When Ownby became too ill, [Marra] hired Noel to drive stolen autos to Ownby in Kansas City.

Ownby and Noel proceeded to develop a friendly relationship. When Ownby and [Marra] argued over the manner in which Noel would be paid, Ownby opted to pay Noel himself, rather than honor [Marra]'s request that Ownby pay [Marra], and allow [Marra] to remit part of the payment to Noel. In the summer of 1983, Ownby began dealing directly with Noel. Shortly thereafter, Ownby terminated almost all of his dealings with [Marra], and began dealing primarily with Noel. [Marra] was "aggravated" with the situation, and his relationships with Ownby and Noel subsequently deteriorated.

In the meantime, the police had begun investigating auto theft in the Bridgeport area, and [Marra] became a subject of that investigation in April, 1983. The police informed [Marra] in October, 1983, that he was a subject of their investigation. During the remaining months of 1983, the police conducted continuous, visible surveillance operations outside [Marra]'s home so that [Marra] was made aware that the police were watching him. In November, 1983, Noel implicated [Marra] in statements to the police, and [Marra] later became aware of Noel's conversations with the police.

Near the end of 1983, [Marra] asked Frank Spetrino to steal a van for him, specifically requesting a van with no windows. Spetrino then stole a blue van for [Marra] on December 21, 1983. On the same night, Spetrino called [Marra] to arrange for delivery of and payment for the van. Spetrino and [Marra] then went to James Kallman's apartment at Pallisade Avenue in Bridgeport. There, they met Kallman, Nicky Byers, Shawn Burns and Paul Lentine. [Marra] asked Spetrino to help him and the others force Noel into the van. [Marra] had previously offered to pay Byers several hundred dollars to hit Noel over the head with an axe handle and drag him into the van. Byers, Spetrino, Kallman, Burns and Lentine, carrying guns and other weapons, rode in the van to 141 French Street in Bridgeport, the location of Noel's apartment, while [Marra] followed in his own car. Spetrino noticed that the van contained a fifty gallon drum that had not been in the van at the time he had stolen it. The group parked outside Noel's apartment, near his car, and waited approximately one hour for him to appear. When Noel failed to appear, the group abandoned the plan and disbanded.

On or about the same day, all of these men went to Robin O'Neill's apartment on Charles Street in Bridgeport. They used the blue van for transportation, and carried guns and other weapons. Kallman, in accordance with a scheme concocted by [Marra], gave O'Neill cocaine and asked her to use the drugs to entice Noel out of the Shamrock Pub, a nearby nightclub. The plan, again engineered by [Marra], was to knock Noel out when he entered the apartment, drag him through the back door of the apartment and throw him into the van. [Marra] drove O'Neill to the Shamrock

Pub, and when she returned alone, [Marra] sent Alex Palmieri into the pub to find Noel. Palmieri was also unsuccessful, and this plan was also abandoned. Later, on January 12, 1984, Burns burned the blue van.

Subsequently, [Marra] asked Spetrino to steal another van for him, and on January 21, 1984, Spetrino stole a van that was two-toned in color, white on the top and green or aqua on the bottom. That same evening, Spetrino parked the van, and called [Marra] to inform him of the van's location. The next day, Spetrino noticed that the van was gone. On January 22, 1984, Ownby called [Marra] from a hotel in Bridgeport, and asked [Marra] to pick him up and drive him to a motel in Fairfield. [Marra] picked up Ownby and a Hispanic man named Julio after 9 p.m., and drove them to a motel in Fairfield. During the drive, Ownby indicated to [Marra] that after that night, there would be no more problems with Noel.

Early the following morning, on January 23, 1984, Margaret Vias awoke at approximately 2 a.m. to the sound of a male voice, coming from outside, screaming: "No, no!" Vias lived on the second floor of the apartment building at 141 French Street, the same building where Noel lived. Looking out of her window, Vias observed two white men near the doors of the building, quickly carrying the limp body of another man by his arms and legs down the sidewalk towards a van parked in front of the building. The two men tossed the other man into the van, which Vias described as yellow, at least ten years old, with a sliding door on the passenger side. A third person, according to Vias, accompanied the two men. Later that morning, Vias went outside and observed a large puddle of blood near the door of the building, a clump of dark brown hair near the puddle, blood splattered from the puddle over to the place where the van had been parked, and a set of keys.

At approximately 3:00 a.m. on January 23, 1984, the same morning that Vias viewed the scene from her window, [Marra] received a call from Ownby, who requested that [Marra] pick him up, help him dispose of a van and drive him to the airport. [Marra] picked up Ownby and Julio, and drove them to a restaurant in Stratford. In the restaurant parking lot, [Marra] saw a green and white van, and asked Ownby whether Noel's body was in the van. Ownby replied: "We already took care of it." [Marra] then looked into the van, and observed a large quantity of blood on its floor, door and sides. Followed by Ownby and Julio in the van, [Marra] next drove to a factory on Lordship Boulevard in Stratford, stopping along the way to purchase a container full of gasoline. Ownby told [Marra] that the van had to be destroyed because it was used in the murder of Noel. [Marra] then doused the inside of the van with gasoline, and Julio ignited the van. The police discovered the burning van behind the factory at 5:22 a.m.

After the van was in flames, Ownby asked [Marra] to drive him to Union Square dock in Stratford, indicating that he wanted to make sure that the container or barrel went down. [Marra] drove Ownby and Julio to the dock, and parked on the ramp with his high beams illuminating the ice below. Ownby got out of the car, and pointed to a drum on the ice, indicating that Noel's body was in the drum. Ownby

then broke the ice below the drum, and the drum sank. When he got back into the car, Ownby told [Marra] that "there would be no more problems with Richie [Noel]." [Marra] then drove Ownby and Julio to a limousine service in Norwalk, where Ownby and Julio arranged for transportation to the airport.

On January 24, the next day, [Marra] called a Stratford garage, identified himself as the manager of a Bridgeport limousine service where Noel was employed, and requested that the garage tow the limousine that Noel drove. [Marra] then drove by Noel's house and noticed that the limousine was gone. Three days later, [Marra] called another Stratford garage, identified himself as Noel, and requested that the garage tow Noel's personal car. [Marra] also, at some point, asked Spetrino to break into Noel's apartment and mailbox for the specified purpose of taking Noel's personal papers and mail, especially bank mail. Spetrino entered Noel's apartment and mailbox on several occasions, and stole a bank envelope, other mail and personal papers belonging to Noel, all of which he delivered to [Marra]. [Marra] also called Nusite Realty Company, the owner of Noel's apartment building, identified himself as Noel, and obtained keys to Noel's apartment.

In mid-February of 1984, [Marra] gave Tamara Thiel ten dollars, and directed her to open a bank account in the name of Marjorie Shea, Thiel's aunt. [Marra] brought Thiel to his home on or about February 23, 1984, showed her Noel's driver's license, and told her to forge Noel's signature on a check in the amount of $4500, payable to the order of Marjorie Shea. [Marra], wearing gloves, wiped off the check with a towel and placed it in an envelope. The check was presented for deposit in the Shea account on February 27, 1984. Two days after Thiel opened the Shea account, [Marra] directed Thiel to call the bank where Noel's account was located, claim she was Noel's fiancee, and state that she needed to withdraw money for Noel, who was in Kansas City. The bank, however, refused to release the money.

On or about February 24, 1984, Thiel forged a second check at [Marra]'s direction. The second check, in the amount of $700, was made payable to Nusite Realty Company. Nusite had previously received a telephone call by a male caller who identified himself as Noel, stated that he was in Kansas City and that he would forward a check covering two months rent. Nusite's manager received the forged rent check in an envelope bearing a return address in Kansas City, and deposited it on March 5, 1984. Since Noel's bank had by this time begun to suspect that someone was tampering with his checks, the check was returned. The bank then closed Noel's account on March 8, 1984. Subsequently, the bank returned two additional checks drawn on Noel's account that had been made payable to Marjorie Shea. The bank determined that none of these checks had been signed by Noel. Furthermore, on or about March 27, 1984, acting with the belief that Noel was dead, [Marra] filed a lawsuit to collect on a promissory note in the amount of $18,000, on which Noel appeared as the maker, and [Marra] as the payee. The suit resulted in a judgment in favor of [Marra].

*Marra*, 215 Conn. at 720-25.

On direct appeal, Marra claimed that: (1) the state's evidence was insufficient to support his conviction for accessory to kidnapping in the first degree; (2) the trial court erred by denying his motion for a mistrial on the ground that pretrial publicity deprived him of a fair trial; (3) the trial court deprived him of the ability to cross-examine Ownby because he was unable to obtain Ownby's medical or psychological records; (4) the trial court deprived him of a fair trial by allowing the clerk to read redacted portions of a warrant affidavit related to murder charges that were pending against him at the time; and (5) the trial improperly permitted the state to introduce evidence of uncharged larcenous misconduct. *Marra*, 215 Conn. at 725-37. On July 24, 1990, the Connecticut Supreme Court rejected Marra's claims on the merits and affirmed the judgment of conviction. *Id.* at 739.

While his direct appeal was pending, Marra filed his first petition for writ of habeas corpus in state court. Pet. at 3; First State Habeas Appeal R., Resp't App. E, Doc. No. 27-7 at 4. He claimed that his trial counsel, Frank Riccio, was ineffective because he failed to (1) properly prepare Marra for his testimony at trial, (2) explain the consequences of testifying at trial, (3) conduct a proper investigation of the case, (4) subpoena Ownby's medical and psychological records, (5) file an adequate motion for mistrial based on unfair pretrial publicity, (6) object to the presence of one juror who had a conflict of interest in the case, and (7) disclose to the court that he had represented a witness who testified against Marra in an unrelated criminal proceeding. Second Am. Pet., Resp't App. E at 8-9. Marra also claimed that his appellate counsel, Timothy Pothin, was ineffective because he failed to (1) properly prepare the Appellate Record to include Ownby's medical and psychological records, and (2) present an "obvious suppression issue, which had been preserved at trial, regarding [Marra's] statements given during a polygraph examination, despite his twenty-two (22) requests for his attorney's presence during

questioning." *Id.* at 10. Finally, Marra claimed that the state deprived him of a fair trial by withholding exculpatory evidence, specifically, audio tapes of interviews with the alleged co-conspirators. *Id.* at 10-11.

On October 2, 1997, after hearing evidence and argument on all claims, the state court dismissed the habeas petition. First State Habeas Appeal R. at 16-28. Marra appealed that ruling to the Connecticut Appellate Court, which dismissed the appeal. *Marra v. Comm'r of Corr.*, 51 Conn. App. 305 (1998), Resp't App. H, Doc. No. 27-10. The Appellate Court concluded that the habeas court did not abuse its discretion in rejecting Marra's claims of ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and that the state deprived him of a fair trial. *Id.* at 308-10, 310 n.2. On February 4, 1999, the Connecticut Supreme Court denied Marra's petition for certification to review the Appellate Court's decision. *Marra v. Comm'r of Corr.*, 247 Conn. 961 (1999), Resp't App. I, Doc. No. 27-11. Marra did not petition the United States Supreme Court for a writ of certiorari to review the state court's decision.

On January 4, 2000, Marra filed a federal petition for writ of habeas corpus in this court. *Marra v. Armstrong*, No. 3:00-cv-233 (SRU). In that petition, Marra claimed: (1) his convictions were obtained in violation of his privilege against self-incrimination because he was not permitted to have his attorney present during the polygraph examination, (2) the state withheld exculpatory information, (3) Attorney Riccio was ineffective during his criminal trial, (4) Attorney Pothin was ineffective on direct appeal, (5) there was insufficient evidence to support his conviction for accessory to kidnapping in the first degree, (6) the trial court improperly denied his motion for mistrial on the ground of pretrial publicity, (7) the trial court improperly permitted Ownby to testify, despite the fact that Attorney Riccio had not received Ownby's psychological records, (8) the trial court improperly denied his motion for mistrial after

the clerk read redacted statements referring to pending murder charges against him, (9) the trial

court improperly permitted the state to introduce uncharged larcenous misconduct evidence, and

(10) Attorney Riccio had not been provided with all taped interviews and statements made by the

witnesses and co-defendants.  *See* Ruling on Pet. for Writ of Habeas Corpus ("Ruling on Federal

Pet."), Ct. App. 1 (attached hereto) at 3-4.  On January 8, 2001, I dismissed that petition without

prejudice after concluding that Marra had failed to exhaust his state court remedies with respect

to all claims raised therein and gave Marra the opportunity to refile his petition after all of his

claims have been presented to the Connecticut Supreme Court.  *See id.* at 7-8.  In dismissing the

petition, however, I cautioned Marra that the one-year statute of limitations period under 28

U.S.C. § 2244(d)(1) had commenced on May 6, 1999, when the time for filing a petition for writ

of certiorari in the United States Supreme Court had expired,[2] and was tolled on the day he filed

his federal petition.[3]  *Id.* at 8 n.1.

Marra filed his second petition for writ of habeas corpus in state court on December 12,

2001, eleven months and four days after I dismissed his first federal habeas petition.  *Marra v.*

*Warden*, No. CV01-0458693-S,[4] Resp't App. J, Doc. No. 27-12 at 2-3.  In his second state

petition, Marra claimed that his first habeas counsel, Raymond Rigat, was ineffective because he

failed to (1) adequately investigate the state's illegal polygraph examination of Marra without the

---

[2] The petitioner has ninety days from the entry of judgment to petition the United States Supreme Court for a writ of certiorari.  *See Wright v. Astrue*, 2008 WL 3891959, at *2 (D. Conn. Aug. 5, 2008).  Because the Connecticut Supreme Court denied certification to review the lower court's decision on February 4, 1999, Marra had until May 6, 1999 to seek review from the United States Supreme Court.

[3] The ruling reflects that Marra filed his first federal petition on February 4, 2000.  *See* Ruling on Federal Pet. at 3, 8 n.1.  However, the docket report in that case shows that the petition was filed on January 4, 2000.  See *Marra v. Armstrong*, No. 3:00-CV-233 (SRU), Docket Report, Ct. App. 2 (attached hereto).  Thus, I will conclude for purposes of this ruling that Marra filed his petition on January 4, 2000, which was 243 days after May 6, 1999.

[4] This case was later consolidated with another habeas action challenging Marra's unrelated 1990 murder conviction and assigned a new docket number, *Marra v. Warden*, No. CV05-4000275.  Resp't Mem. at 4.  In addition to the claims against his habeas counsel, Raymond Rigat, Marra raised a number of ineffective assistance claims against Riccio, who represented him in his murder trial, and Thomas Conroy, who represented him in his state habeas action challenging his murder conviction.  Marra has not contested the procedural history of this case, nor is he challenging the 1990 murder conviction in this action.

presence of counsel, (2) raise a claim that Attorney Pothin failed to challenge on direct appeal the trial court's ruling denying Marra's motion to suppress the audio tapes from the polygraph examination, (3) review the audio tapes from the polygraph examination for exculpatory information, (4) raise claims that Attorney Riccio failed to object to the trial court's instruction on the presumption of innocence and that Attorney Pothin failed to challenge the instruction on direct appeal, (5) challenge the state's improper recording of confidential conversations between Marra and Attorney Riccio, (6) challenge the state's use of the recorded attorney-client tape recordings during the habeas trial, and (7) adequately investigate, raise, and support a claim that the state withheld exculpatory evidence, including tapes, notes, transcripts, and memoranda from interviews with several witnesses, Marra's co-defendants, the state's confidential informant, and reports from the state forensic laboratory or the State's Attorney's Office. Fourth Am. Pet., Resp't App. K, Doc. No. 27-13 at 4-18. On October 23, 2012, Marra withdrew this petition with prejudice, and the state habeas court accepted the withdrawal. Tr. of Hrg. on Second Habeas Pet., Resp't App. M, Doc. No. 27-15 at 18.

Twenty-one days later, on November 14, 2012, Marra filed a third petition for writ of habeas corpus in state court. *Marra v. Warden*, No. TSR-CV13-4005093-S (Conn. Super. Ct. Nov. 14, 2012); *Marra v. Comm'r of Corr.*, 174 Conn. App. 440, 450 (2017), Resp't App. R, Doc. No. 27-20. In this petition, Marra again claimed that Attorney Rigat rendered ineffective assistance by failing to challenge the adequacy of Attorney Riccio's and Attorney Pothin's representation during the criminal trial and on direct appeal. *Marra*, 174 Conn. App. at 450. The state habeas court dismissed the petition pursuant to the deliberate bypass doctrine and for lack of subject matter jurisdiction because Marra had knowingly withdrawn those claims in his second petition. *See id.* at 452. On appeal, the Appellate Court agreed that Marra had

withdrawn the claims against Attorney Rigat with prejudice but reversed the lower court's ruling only as to the form of the judgment.[5]  *Id.* at 461-62.  On November 2, 2017, the Connecticut Supreme Court denied the petition for certification to review the Appellate Court's decision. *Marra v. Comm'r of Corr.*, 327 Conn. 955 (2017), Resp't App. T, Doc. No. 27-22.

While his third habeas petition was pending on appeal, Marra filed a fourth petition for writ of habeas corpus in state court.  *Marra v. Warden*, No. TSR-CV15-4007234-S (Conn. Super. Ct. May 27, 2015).  That matter remains pending and is scheduled for trial on March 16, 2020.  *Id.*

On March 5, 2018, Marra filed the instant federal petition.  Pet.  In this petition, Marra states nine grounds for relief related to his 1988 kidnapping trial:  (1) the state improperly recorded confidential communications between Marra and Attorney Riccio; (2) the state improperly obtained recordings of the conversations between Marra and Attorney Riccio without a warrant; (3) the state improperly subjected Marra to questions during a polygraph examination without his attorney present; (4) the state improperly withheld evidence that they had granted immunity to witnesses who testified against Marra during the trial; (5) during the trial, the state improperly permitted their witnesses to give perjured testimony that they had not been granted immunity; (6) the state suppressed exculpatory evidence, including notes, tapes, reports, and memoranda from witness interviews, forensic experts, informants, and co-defendants; (7) the trial court improperly instructed the jury on the presumption of innocence; (8) Attorney Rigat was ineffective in failing to (a) challenge the effectiveness of Attorney Riccio's and Attorney Pothin's representation, and (b) properly raise due process claims concerning the state's misconduct in recording Marra's conversations with Attorney Riccio and withholding

---

[5] Specifically, the Appellate Court concluded that the lower court should have denied the petition based on the prior withdrawal rather than dismiss the petition for lack of jurisdiction.  *See Marra*, 174 Conn. App. at 461-62.

exculpatory evidence; and (9) the state withheld evidence that one its investigators had sexual relations with a witness during the investigation of the case.  Pet. at 13-37.

III.     Analysis

In support of his motion to dismiss, the respondent claims that the instant petition is time-barred because more than one year elapsed between the date Marra's convictions became final and the date he filed his second state habeas petition, and another twenty-one days elapsed between the withdrawal of the second state petition and the filing of the third petition.  Resp't Mem. at 11.  Alternatively, the respondent contends that none of the claims raised in this petition has been exhausted, with the exception of the ineffective assistance claim against Attorney Rigat, which Marra had withdrawn with prejudice.  *Id.* at 14.  In response, Marra argues that his petition is not time-barred because, on January 8, 2001, I gave him the opportunity to refile his federal petition after exhaustion of his state court remedies.  Marra's Suppl. Resp. at 2.  Marra acknowledges, however, that he has not fully exhausted his state court remedies and requests that I again dismiss his petition without prejudice so that he can fully exhaust his claims in state court.  Marra's Mot. to Withdraw at 1.  I agree with the respondent that Marra's petition is time-barred and subject to dismissal in its entirety.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") restricts the ability of prisoners to seek federal review of their state criminal convictions.  *Smith v. McGinnis*, 208 F.3d 13, 15 (2d Cir. 2000).  AEDPA provides a one-year statute of limitations for federal habeas actions filed by prisoners in custody pursuant to a state court judgment.  28 U.S.C. § 2244(d)(1); *Murphy v. Strack*, 9 F. App'x 71, 72 (2d Cir. 2001).  The one-year limitations period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). A state habeas action or other form of post-conviction review tolls or interrupts the running of the limitation period. 28 U.S.C. § 2244(d)(2); *Smith*, 208 F.3d at 17. When the state post-conviction review terminates, the "clock restarts" and the limitation period resumes. *Holland v. Florida*, 560 U.S. 631, 638 (2010) (citing *Coates v. Byrd*, 211 F.3d 1225 (11th Cir. 2000)).

As I stated in the ruling dismissing the first federal petition, Marra's judgment of conviction became final under section 2244(d)(1)(A)[6] on May 6, 1999, the expiration of time during which Marra could have petitioned the United States Supreme Court for a writ of certiorari to review the state court's decision on his first state habeas petition. Marra filed his first federal habeas petition 243 days later, on January 4, 2000. After I dismissed that petition on January 8, 2001, Marra waited another 338 days before filing his second state habeas petition on December 12, 2001. Another twenty-one days elapsed between the withdrawal of the second state habeas petition and the filing of the third state habeas petition. Thus, a total of 602 days (or one year and eight months) elapsed between the finality of the judgment and the filing of the instant petition when there were no actions pending in state court challenging Marra's 1988 kidnapping case.

Although I dismissed Marra's first petition without prejudice and granted him one opportunity to refile his petition following exhaustion, I specifically cautioned him that the

---

[6] Marra makes no claim that any of the other provisions of section 2244(d)(1) apply to the timeliness of his petition.

limitations period had commenced on May 6, 1999 and was tolled upon the filing of the first petition. *See* Ruling on Federal Pet. at 8 n.1. At that time, Second Circuit precedent established that a properly filed federal petition tolled the AEDPA limitations period. *See Walker v. Artuz*, 208 F.3d 357, 359 (2000). In an opinion dated June 18, 2001, after my dismissal of the initial petition, the United States Supreme Court reversed *Walker* and held that the tolling provision under section 2244(d)(2) did not apply to applications for federal habeas corpus review. *Duncan v. Walker*, 533 U.S. 167, 181-82 (2001).

Nevertheless, my January 2001 ruling did not toll the limitations period indefinitely, thereby granting Marra the ability to return to federal court at any point in time following exhaustion. *See Smith*, 208 F.3d at 17 (tolling provision of AEDPA does not allow one-year period to run anew each time judgment is entered in in post-conviction motion); *Comfort v. Gorenflo*, 1986 WL 10301, at *2 (W.D.N.Y. Jan. 8, 1986) (dismissal of initial complaint without prejudice did not grant plaintiff "unrestricted license to refile his complaint . . . at any time whatsoever"). In accordance with then existing Second Circuit precedent, the ruling only tolled the limitations period during the time the federal petition was *pending*. *See Evans v. Senkowski*, 105 F. Supp. 2d 97, 99-100 (E.D.N.Y. 2000) (AEDPA only excludes from one-year limitations period time during which post-conviction relief is pending) (citing *Smith*, 208 F.3d at 17). Once the dismissal order was entered, the limitations period resumed, and Marra had 122 days to return to federal court. However, he waited nearly a year before attempting to exhaust any claim in state court, exceeding the limitations period under § 2244(d)(1).

Marra argues that he is entitled to equitable tolling of the limitations period because (1) the attorney who represented him on appeal from his third state habeas petition, Cheryl Juniewic, did not notify him until January 2018 that the Connecticut Supreme Court, on November 2,

2017, had denied certification to review the lower court's decision; Marra's Suppl. Resp. at 3; *Marra*, 327 Conn. 955; and (2) he did not have access to legal resources because the Connecticut Department of Correction had destroyed all of legal paperwork. Marra's Suppl. Resp. at 3. A petitioner is entitled to equitable tolling of the limitations period "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

Neither of Marra's arguments justify equitable tolling in this case. When the Connecticut Supreme Court entered final judgment on his third state habeas action, the limitations period had already expired. As noted above, the limitations period expired before Marra even filed his *second* state habeas petition. Turning to his second argument, courts in this Circuit have ruled that ignorance of the law or limited access to prison law library resources do not constitute extraordinary circumstances that toll the limitations period. *See Mitchell v. Comm'r of Corr.*, 2019 WL 188694, at *6 (D. Conn. Jan. 14, 2019); *Francis v. Miller*, 198 F. Supp. 2d 232, 235 (E.D.N.Y. 2002). Marra has not explained why he did not seek any post-conviction relief between January 8, 2001 and December 12, 2001. *See Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000) (petitioner failed to exhibit reasonable diligence during one year and eight months between dismissal of first petition and filing of second petition). Therefore, I do not conclude that the circumstances in this case warrant equitable tolling.

Because Marra failed to seek any form of post-conviction relief for eleven months after my ruling dismissing his first federal petition, I agree with the respondent that the instant petition is time-barred. While the parties agree that all of the claims raised in the instant petition are not exhausted, I need not again address the exhaustion issue because the expiration of time during

which Marra could have sought federal habeas corpus review warrants a dismissal of this action with prejudice.

IV.    Conclusion

Based on the foregoing, the respondent's Motion to Dismiss the petition, Doc. No. 27, is **GRANTED**, and Marra's Motion to Withdraw the petition without prejudice, Doc. No. 29, is **DENIED**.  The clerk is directed to dismiss the petition with prejudice and close this case.

Because no reasonable jurist could conclude that the instant petition was timely filed, a certificate of appealability will not issue.

So ordered.

Dated at Bridgeport, Connecticut, this 6th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge